UNITED STATES, Appellee,

v.

Jose C. RODRIGUEZ, Master Sergeant
U.S. Army, Appellant.

No. 67,910.
CMR No. 9000201.

U.S. Court of Military Appeals.

Argued Jan. 6, 1993.
Decided Sept. 20, 1993.

For Appellant: *Captain Teresa L. Norris* (argued); *Colonel Malcolm H. Squires, Jr., Lieutenant Colonel James H. Weise, Major Fran W. Walterhouse* (on brief); *Colonel Robert B. Kirby* and *Captain Michael P. Moran.*

For Appellee: *Major Joseph C. Swetnam* (argued); *Colonel Dayton M. Cramer, Lieutenant Colonel Joseph A. Russelburg* (on brief); *Lieutenant Colonel Daniel J. Dell'Orto.*

*Opinion of the Court*

WISS, Judge:

A special[1] court-martial composed of officer and enlisted members convicted appellant, over his pleas, of wrongful use of cocaine and sentenced him to a bad-conduct discharge and reduction to the lowest enlisted grade. *See* Art. 112a, Uniform Code of Military Justice, 10 USC § 912a. The convening authority approved these results, and the Court of Military Review affirmed. 34 MJ 562 (1991).

On appellant's petition, we granted review of the following issue:

WHETHER THE ARMY COURT ERRED IN HOLDING THAT THE MILITARY JUDGE DID NOT ABUSE HIS DISCRETION IN PERMITTING A GOVERNMENT POLYGRAPH EXAMINER TO TESTIFY IN REBUTTAL, OVER DEFENSE OBJECTION, THAT APPELLANT SUBMITTED TO A POLYGRAPH EXAMINATION AND THAT THE EXAMINATION INDICATED THAT APPELLANT WAS UNTRUTHFUL WHEN HE DENIED USING COCAINE.

We hold that the court below did err in finding that the military judge did not abuse his discretion in admitting the rebuttal testimony. The Government, as the party offering the evidence, did not carry its burden to establish the requisite foundation of its reliability. *See United States v. Gipson*, 24 MJ 246 (CMA 1987); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, — U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Because we are unable to conclude that there is no fair risk that appellant was prejudiced by this error, the findings and sentence must be set aside.

## I

Appellant is a senior noncommissioned officer with nearly 20 years of active military service. On July 25, 1989, while serving in Panama, he submitted a urine sample to military authorities during an unannounced urine inspection of members of his unit, *see* Mil.R.Evid. 313(b), Manual for Courts–Martial, United States, 1984. Subsequent analysis of the sample revealed presence of cocaine metabolites, so appellant was charged with wrongful use of cocaine.

Prior to any charges being preferred and after consulting with his defense counsel, appellant requested that criminal investigators administer a polygraph examination of him in an effort to clear his name. Defense counsel had advised appellant that, regardless of the outcome, the results of the examination likely could not be admitted in a court-martial but could be considered against him at proceedings under Article 15, UCMJ, 10 USC § 815.

During the "preinstrument phase of the examination," appellant denied knowing use of cocaine and asserted the possibility of innocent ingestion. He explained that, a few days prior to the urinalysis, he had visited an off-post drinking establishment and had consumed both alcoholic beverages and cigarettes. He suggested "that it was at that particular establishment where he may have unknowingly consumed either through the liquor or the cigarettes the cocaine which caused the positive urinalysis result."

Immediately after the examination, the polygrapher evaluated the results and advised appellant that he believed appellant had been "practicing deception while answering the relevant questions" during the examination. Under agreement between defense counsel and the polygrapher, however, there was no "post-instrument phase" of the examination—that is, no interview of appellant after he was removed from the polygraph. Subsequently on that same day, the instant charge was preferred against appellant.

At trial, the Government moved *in limine* to admit the results of the examination under Mil.R.Evid. 702. The Government indicated that it would use this evidence only if appellant testified and denied use of cocaine during the relevant time

---

1. The decision below erroneously says this was a general court-martial. 34 MJ 562.

period. Special Agent Widup—a qualified Army criminal investigator and the polygrapher who had administered the examination to appellant—testified to lay a foundation to support the motion.

Widup stated during his testimony that he utilizes "the theory of psychological set" in his testing. This approach "holds that when a person is presented with a set of questions, that they will focus their concern on a question or a set of questions which pose the most harm to their well-being." Specifically, when testing appellant, he had used the "modified general question technique," which includes three types of questions: relevant questions, which deal with the particular incident under investigation; control questions, which deal with subject matter "similar to" the relevant issue but "separated" from it "by category and/or time"; and irrelevant questions, which have nothing to do with the relevant issue.

In theory, if a person is involved in the incident under investigation, he will be more threatened by the relevant questions; if he is not involved in the incident, he will be more troubled by the control questions. The irrelevant questions simply "reestablish a base line" on the chart during the examination. In other words, "an old lie will trouble an innocent man more than a crime he is charged with committing" if he is innocent of that crime.

Widup testified that "the relevant questions" asked appellant were as follows:

Did you knowingly possess any cocaine within 30 days of that urinalysis?

Did you knowingly use any cocaine within 30 days of that urinalysis?

Are you lying about receiving advance knowledge of that urinalysis?

Did you knowingly ingest any cocaine in any manner within 30 days of that urinalysis?

He concluded that "deception" was indicated in appellant's negative answers to these questions.

Widup acknowledged, however, that "you cannot deduce from that particular conclusion that he may be lying about one issue and not lying about another." Specifically, Widup was not able to "differentiate whether he's lying about advance knowledge [of the inspection] or whether he's lying about use." Further, Widup recognized that "physiological reaction[s]" like those measured in a polygraph can be caused by any number of things other than lying. Factors such as "extraneous noises," "[v]isual stimuli," "emotional complexes associated with a particular word or a question," or even "random thoughts" could cause physical reactions that are measured as positive responses for deception on a polygraph.

Though the defense did not challenge the qualifications of Agent Widup, it did object to the motion to admit the polygraph result on several grounds. Principally, the essence of the objections was as follows: First, the evidence was not relevant because the examiner's conclusion of deception could not be narrowed to questions relating to wrongful use, as opposed to simply being a broad conclusion of deception, *see* Mil.R.Evid. 401 and 402; second, for similar reasons, the evidence was not helpful to the trier of fact, *see* Mil.R.Evid. 702; third, again for similar reasons, the evidence would confuse and mislead the members and would pose risks of unfair prejudice that far outweighed its probative value, *see* Mil.R.Evid. 403; and fourth, reliability of the polygraph had not been established by scientific proof, so the evidence was not valid in any event.

Nonetheless, the military judge ruled that, if appellant testified and denied use of cocaine, he would permit the Government to use Widup's testimony about his polygraph conclusions in order "to assist the trier of fact to determine the credibility of the accused under those circumstances." The military judge reasoned:

I am convinced of the soundness and reliability of the process and technique used in forming the polygrapher's opinion in this case. I do not think that the evidence will overwhelm or confuse or mislead the jury, and I believe that if presented it will help them to determine

the credibility of the—of the accused under the circumstances.

After the Government had concluded its case on the merits, appellant renewed his objection to this evidence, without success. Thereafter, appellant testified in his own defense; he swore that he had never knowingly used cocaine and had no idea how he had come up "hot" on the urinalysis. He also indicated that he had known of the impending test—with the arguable implication that under that circumstance, appellant would not have risked his career by knowingly ingesting cocaine. He acknowledged having taken a polygraph examination and acknowledged, too, that the examiner had informed him that the test had indicated deception.

At that point, the defense again sought to exclude Widup's testimony. Citing Mil. R.Evid. 403, the defense argued that the anticipated evidence from the prosecution would be "overkill," in light of appellant's candid admissions regarding the polygraph examination. Not convinced, the military judge renewed his earlier ruling. Ultimately, Widup did testify, in prosecution rebuttal, that appellant had been "practicing deception while answering the relevant questions." Additionally, he was permitted to testify that, in his opinion, appellant "was not being truthful" during the examination.

Prior to the members' deliberating on the question of guilt, the military judge instructed, *inter alia,* as follows:

> You have also heard the testimony of Special Agent Widup concerning polygraph examinations. He too has been accepted by me as an expert witness because his knowledge, skill, training, or education which may assist you in understanding the evidence or in determining a fact in issue. Again, you are not required to accept the testimony of any expert witness or give it more weight than the testimony of any other witness.

> You should, however, consider the qualifications of this expert witness. Further, you must consider the sole purpose of which the polygraph evidence was introduced and that is to assist you in evaluating the credibility of the court—of the accused's in-court testimony. This evidence was introduced for whatever tendency it may have to rebut the accused's testimony that he never knowingly ingested cocaine, which would, of course, include a denial that he knowingly ingested it during the period charged. Polygraph examinations have historically been viewed with great skepticism and you should examine this evidence very critically. You have heard the testimony of Mr. Widup as to how the test was conducted and the theory of how a polygraph operates. The weight to be given to this evidence, if any, is solely within your discretion. You should assess the theory of physiological responses upon which the polygraph analysis is based along with all the other evidence that Mr. Widup provided. Now, the polygraph has been commonly and incorrectly referred to as a lie detector. At best, and you don't have to consider this to be true, but at best it is capable of measuring physiological responses at a particular point in time. Further, in evaluating this evidence you should consider the fact that you have had the opportunity to observe the accused and his demeanor in court, while you were not present and did not have the opportunity to observe the polygraph examination.

## II

In *United States v. Gipson,* 24 MJ 246 (1987), this Court concluded that results of polygraph examinations are not *per se* inadmissible as scientifically unreliable.[2] *Accord United States v. West,* 27 MJ

---

2. Subsequent to appellant's trial, the President approved Mil.R.Evid. 707, Manual for Courts-Martial, United States, 1984, effective July 6, 1991. *See* Art. 36(a), Uniform Code of Military Justice, 10 USC § 836(a). Subsection (a) of that rule provides:

Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence.

223, 225 (CMA 1988). The majority in *Gipson* observed, "The greater weight of authority indicates that it can be a helpful scientific tool." Neither, however, is polygraph examination at the top level of reliability as scientific evidence—the level at which "the principles underlying the expertise are so judicially recognized that it is unnecessary to reestablish those principles in each and every case," such as fingerprint or ballistic evidence. Rather, polygraph principles fall in the middle level, the "range of scientific and technical endeavor that can neither be accepted nor rejected out of hand." 24 MJ at 249.

In any given case in which polygraph evidence is offered, the benchmarks against which admissibility must be determined are Mil.R.Evid. 401, 402, 403, and 702. "Taken together, the[se] rules seem to describe a comprehensive scheme for processing expert testimony." 24 MJ at 251. Addressing Mil.R.Evid. 401 and 702, Judge Cox observed:

> For any type of evidence to have logical relevance [under Mil.R.Evid 401], however—scientific evidence included—some degree of reliability is implicit. [*United States v. Downing*,] 753 F.2d [1224] at 1238 [ (3d Cir.1985) ]. In addition, the helpfulness standard of Fed. R.Evid. 702 [and Mil.R.Evid. 702] is said to "impl[y] a quantum of reliability beyond that required to meet a standard of bare logical relevance." *Id.* [753 F.2d] at 1235.

*Accord Daubert v. Merrell Dow Pharmaceuticals, Inc., supra.*

■ If a military judge does admit polygraph evidence consistent with these principles, the scope of the permissible use of that evidence is clear:

> First and foremost, while polygraph evidence relates to the credibility of a certain statement, it does not relate to the declarant's character. At best, the expert can opine whether the examinee was being truthful or deceptive in making a particular assertion *at the time of the polygraph exam.* It is then for the factfinder to decide whether to draw an inference regarding the truthfulness of the examinee's *trial* testimony.

24 MJ at 252–53 (footnote omitted).

■ While the military judge's instructions, as a whole, do appear to limit the proper use of this evidence consistent with the opinion in *Gipson*, we conclude that the Government here did not succeed in laying the necessary foundation of reliability that is inherent in satisfying Mil.R.Evid. 401, 402, and 702. 24 MJ at 251.

First, the polygraph examination here did not permit the examiner's conclusion of deception to focus and differentiate between questions relating to criminal conduct (that is, possession and knowing use of cocaine) and innocent conduct (that is, learning in advance of the impending urinalysis). It is true that appellant testified on both areas at trial, so one might argue that a showing of deception in either event would be relevant to factfinders in judging the credibility of appellant's in-court testimony. The impact on the factfinders might differ substantially, however.

■ For instance, if appellant were deceptive about claiming advance knowledge of the test, factfinders might not place much weight on that deception; instead, they might even view it as a human-instinct response of an innocent man to grasp at any straw—even a fabrication—to convince his peers of his innocence. The impact from a conclusion of deception relating to criminal conduct at issue in the trial, however, might be dramatically more serious. If the polygraph examiner could have con-

---

In Judge Wiss' view, to the extent that, consistent with *Gipson, see* opinion, *infra,* an accused is able to carry his foundation burden of demonstrating relevance, reliability, helpfulness to the factfinder, and relatively minor risk of confusion of the factfinder, due process and fundamental fairness might seem to compel admission of exculpatory polygraph evidence, not-

withstanding this rule. *See United States v. Gipson,* 24 MJ 246, 252 (CMA 1987). These same concerns, of course, do not weigh as heavily in favor of the prosecution. *But cf. United States v. Barger,* 931 F.2d 359, 370 (6th Cir.1991). Ironically, then, it seems to him that Mil.R.Evid. 707(a) might be a rule of evidentiary exclusion that applies only to the Government.

cluded that appellant was deceptive in responding to the questions relating to his knowing ingestion of cocaine, the factfinders might be predicted to view his similar in-court disclaimers with a good deal of skepticism. The failure of the Government here to differentiate between the possible areas of deception undermines the reliability of the evidence offered in this case.

Second, no "post-instrument" interview of appellant was conducted here as part of the examination. Widup, however, testified that such an interview "is normally required." Regardless that the interview was omitted under agreement between defense counsel and the polygrapher, the fact remains that such a significant departure from the procedure that is "normally required" makes it incumbent on the proferring party to demonstrate that that omission does not undermine the examination's reliability. The Government did not do so here. In fact, the indications at trial were to the contrary: that a post-instrument interview would have been helpful to differentiate the basis for appellant's deception on the relevant questions—the point just discussed above.

■ Finally, it was revealed at trial that the polygraph report incorrectly reflects appellant's response to a critical control question. When asked about this, Widup explained that the error was typographical. The fact remains, however, that an answer to an important control question was erroneously recorded—a fact that does nothing to prop up the reliability of this polygraph examination.

### III

■ We are unable to conclude, as the Government would have us do, that there is no fair risk that appellant was not prejudiced by this error. Appellant forthrightly put his lengthy good service and his explicit denial of ever having used cocaine up against the prosecution's case, which consisted of nothing more than the urinalysis results plus expert interpretation. That would seem, under normal circumstances, to be an interesting contest for the factfinders to resolve.

Admission of scientific evidence, accompanied by an opinion of an expert witness interpreting that evidence, indicating that appellant had been deceptive during a polygraph examination that related to the charges to be decided by the factfinders, however, removed any interesting aspect from that contest. The credibility of appellant's denials—surely a critical part of his case—was devastated. Given the failure of the Government to establish the reliability of this weapon of devastation, we cannot fairly conclude that appellant was unharmed by it.

### IV

The decision of the United States Army Court of Military Review is reversed. The findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

Chief Judge SULLIVAN and Judges COX and GIERKE concur.

CRAWFORD, Judge (concurring in the result):

I concur in the result because of the failure of the Government to establish a suitable foundation for admission of the polygraph examination. I also wish to reply to the footnote contained in the majority opinion. Neither due process and fundamental fairness nor Article 46, Uniform Code of Military Justice, 10 USC § 846, compels admission of exculpatory polygraph evidence notwithstanding Mil. R.Evid. 707(a), Manual for Courts–Martial, United States, 1984 (effective July 6, 1991). Under the new change to the Military Rules of Evidence, absent a pretrial or post-trial agreement as to use of the results of a polygraph examination, such results are no longer admissible in evidence. *See supra*, 37 MJ at 451.

## I

In *United States v. Gipson*, 24 MJ 246, 253 (CMA 1987), this Court indicated that the proponent of polygraph-examination evidence must lay a sufficient foundation including "the competence of the examiner, the suitability of the examinee, the nature of the particular testing process employed, and such other factors as may arise...." In this instance the proponent did not lay a foundation as to the nature of the testing process by differentiating between questions related to criminal conduct and innocent conduct. Additionally, the polygraph examiner did not conduct a post-polygraph interview to analyze the questions and answers to determine whether they were understood and correctly evaluated.

## II

If this Court were writing from a clean slate as it was in *Gipson*, it could adopt one of the three approaches taken in the Federal courts regarding admissibility of polygraph examinations. *See, e.g., United States v. Slozes*, 1 USCMA 47, 1 CMR 47 (1951). One approach is that set forth in *Gipson*, which permits polygraph examinations in the discretion of the military judge. A second approach is to allow the results of a polygraph where the parties have stipulated to admissibility before the examination is administered. P. Giannelli & E. Imwinkelried, *Scientific Evidence* § 8.3(B) at 248 (1986 & Supp.1991). A third approach is to exclude all polygraph evidence. *Id.* at § 8.3(A) at 244. Effective July 6, 1991, Mil.R.Evid. 707(a) will apply.

What happens if there is no clean slate? As this Court stated in *United States v. Villasenor*, 6 USCMA 3, 7, 19 CMR 129, 133 (1955):

We have consistently recognized that where a Manual provision does not lie outside the scope of the authority of the President, offend against the Uniform Code, conflict with another well-recognized principle of military law, or clash with other Manual provisions, we are duty-bound to accord it full weight....

*See also United States v. Boland*, 20 USCMA 83, 42 CMR 275 (1970); *United States v. Johnson*, 18 USCMA 436, 40 CMR 148 (1969); *United States v. Houston*, 17 USCMA 280, 38 CMR 78 (1967); *United States v. Smith*, 13 USCMA 105, 32 CMR 105 (1962). Applying this rationale, this Court followed the prior Manual provisions holding polygraph evidence inadmissible. *United States v. Ledlow*, 11 USCMA 659, 29 CMR 475 (1960).

Mil.R.Evid. 707(a) does not prohibit use of the results of polygraph examinations at the pretrial or post-trial stage of a criminal proceeding. *See, e.g., United States v. Carr*, 18 MJ 297 (CMA 1984). It is permissible for the accused to agree to take a polygraph on the condition that the convening authority agrees to dismiss the charges if the examination shows no deception. This same sort of agreement might also take place post-trial for considerations such as leniency in sentencing or dismissal of the charges. These sort of agreements allow the parties to resolve the objections to the polygraph evidence among themselves and alleviates the concern that there will be a battle of experts at trial.

## III

A concomitant right of the defense to introduce polygraph evidence at trial is the right to compel an examination. With our Armed Forces deployed to the far flung points of the globe, this is simply unworkable. One needs only to consider hypothetically a sailor on a destroyer in the Red Sea requesting a polygraph examination to assert this innocence of some crime. Must that individual be flown to an installation that has polygraph capability or, contrariwise, must a polygrapher and his or her equipment be flown to the destroyer to perform this examination? When one considers the number of investigations, administrative actions, and nonjudicial punishments taking place in all of the services during any particular day, the burden imposed by a right to present polygraph evidence immediately becomes apparent.

## IV

Neither the Constitution nor the Code requires admissibility of polygraph evidence. In *United States v. A. & S. Council Oil Company*, 947 F.2d 1128, 1133–34 (1991), the Court of Appeals for the Fourth Circuit held that the Sixth Amendment does not give the defendant the right to introduce a polygraph examination to impeach a key government witness. As the Supreme Judicial Court of Massachusetts stated in *Commonwealth v. Mendes*, 406 Mass. 201, 210–11, 547 N.E.2d 35, 40 (1989), cases from other jurisdictions "demonstrate a nearly unanimous judicial consensus ... that polygraphic evidence, at least in the absence of a pretest stipulation, ought not to be admitted as evidence in a criminal trial for any purpose."

The Court of Appeals for the Seventh Circuit in *McMorris v. Israel*, 643 F.2d 458 (7th Cir.1981), *cert. denied*, 455 U.S. 967, 102 S.Ct. 1479, 71 L.Ed.2d 684 (1982), granted a habeas petition where credibility was critical to the case. Then Justice Rehnquist characterized *McMorris* as "a dubious constitutional holding." 455 U.S. at 970, 102 S.Ct. at 1480. Some courts have simply rejected the argument that the prosecution is required to provide reasons for its refusal to stipulate. Others reject the broad proposition that there is a constitutional right to present polygraph evidence. *See, e.g., Houston v. Lockhart*, 982 F.2d 1246, 1257 (8th Cir.1993); *United States v. A & S Council Oil Co.*, 947 F.2d at 1133–34.

Our cases prior to *Gipson* implicitly recognized that there is no constitutional right to introduce the results of polygraph examinations based on the Due Process Clause. Article 46 does not require admissibility of defense polygraph evidence, either. Therefore, there is likewise no concomitant right to compel a polygraph examination.

## V

Even without Mil.R.Evid. 707, *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* ——

U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), may support a judge's ruling to exclude polygraph examinations. In *Daubert* the Court held that the general-acceptance test of *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), has been superceded by Fed.R.Evid. 702. —— U.S. at ——, 113 S.Ct. at 2793. Beyond this, the Justices all agreed that trial judges exercise some "gatekeeping responsibility." *Id.* at ——, 113 S.Ct. at 2795 n. 7. Justice Blackmun, speaking for seven members of the Court, set forth what judges might do in considering admissibility of expert testimony in the future. First, in exercising the gatekeeping function the trial judge should determine whether the scientific technique has been tested. *Id.* at ——, 113 S.Ct. at 2796. Citing scientific authorities the Court recognized that the hallmark of science is empirical testing. Second, the judges could look at "peer review and publication"; sometimes these reviews detect an error in methodology. Third, a technique's "known or potential rate of error" is also a relevant factor. Fourth, the judge could consider "the existence and maintenance of standards controlling the technique's operation" as another indicia of reliability. The Court also noted several additional factors that have been proposed by other authors. The Court indicated that the "overarching subject is the scientific validity—and thus the evidentiary relevance and reliability" of the evidence presented. —— U.S. at ——, 113 S.Ct. at 2797. The Court further stressed considering whether the theory or technique can be scientifically tested—that is, capable of an empirical evaluation.

Thus, absent Mil.R.Evid. 707(a), a military judge applying the rationale of *Daubert* could properly exercise discretion to exclude the results of a polygraph examination. This would hold true whether the results were inculpatory or exculpatory, or whether they were sought to be introduced by the Government or by the accused.