**UNITED STATES**

v.

**Luis E. TORRES–RODRIGUEZ,**
583 27 8221, Private (E–1),
U.S. Marine Corps.

**NMCM 91 1124.**

U.S. Navy–Marine Corps Court of
Military Review.

Sentence Adjudged 27 Oct. 1990.

Decided 7 May 1993.

LT Randall L. Chambers, JAGC, USNR,
Appellate Defense Counsel.

LT Dwight N. Mersereau, JAGC, USNR,
Appellate Government Counsel.

Before LARSON, C.J., and
STRICKLAND and ORR, JJ.

LARSON, Chief Judge:

Pursuant to his pleas, the appellant was convicted of three orders violations concerning weapons safety and false swearing, under Articles 92 and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892 and 934, respectively. Contrary to his pleas, he was convicted, by officer members, of the unpremeditated murder of a fellow Marine in violation of Article 118(2), UCMJ, 10 U.S.C. 918(2). He was sentenced to forfeiture of all pay and allowances, confinement for 20 years and a dishonorable discharge. The sentence was approved by the convening authority. Before this Court, the appellant assigns two errors. We summarily reject the first but

find merit in the second for the reasons set forth below.[1]

The only issue before the trier of fact was whether the appellant intended to kill the victim when he shot him.[2] The evidence establishes that, while the appellant and the victim were standing sentry duty together at a naval air station during daylight hours on 14 June 1990, the appellant pointed his M–16 rifle at the victim's head at a distance of 8″ to 12″ away, chambered a round (i.e., pulled the chambering lever aft to move a round from the magazine into the rifle chamber), and pulled the trigger.

Before the incident, witnesses reported nothing unusual about the appellant's demeanor or attitude or that there appeared to be any friction between him and the victim. The two had been roommates at an earlier time and there was no evidence of any prior confrontation or existing ill will between them.

The witnesses also testified that the procedures to prepare the two Marines for duty were followed to the letter. These procedures included clearing the weapon to ensure that no round was in the chamber and placing the safety toggle switch in the "semi" (for "semi-automatic") position for guard duty.

A distant witness who heard the shot observed the appellant throw his hat to the ground in apparent anger and heard him exclaim: "get up, goddamit." The appellant immediately reported the incident to the Corporal of the Guard who sent assistance. When others arrived, the appellant was applying pressure to the victim's wound in an apparent attempt to stop the bleeding.

Soon after the incident, the appellant falsely told the assigned agent of the Naval Investigating Service (NIS) that the victim had shot himself. He stuck to that false story for 3 days. On 17 June, he repeated to the duty Corporal of the Guard that he had told a friend the night before that he (the accused) had nothing to worry about because "dead men don't talk." Later that same day, the appellant was interrogated a second time by an NIS agent and he confessed to shooting the victim in the manner described above, except that he stated that he had switched the safety one notch to what he thought was the "safe" position. That same night, the appellant was overheard talking to his mother at a public pay phone. He was heard to say that he was the one who had fired the weapon at the victim.

During his 4–year active duty period, the appellant had received standard training on weapons safety. His record reveals that he attained at least the minimum level of proficiency with the M–16 rifle six times. During one additional qualification period, in April 1989, he failed to qualify. However, in two more sessions with the M–16 after April 1989, he did qualify.

Before we can affirm findings of guilty, we must ourselves be convinced of the appellant's guilt beyond a reasonable doubt, recognizing that the trier of fact saw and heard the witnesses. *United States v. Turner*, 25 M.J. 324 (C.M.A.1987); Article 66(c), UCMJ, 10 U.S.C. § 866(c). In particular, we must be convinced beyond a reasonable doubt that the appellant specifically intended to kill the victim when he pulled the trigger.[3] Intent to kill may be

1. I. THE MILITARY JUDGE ERRONEOUSLY ADMITTED THE IRRELEVANT AND UNDULY PREJUDICIAL TESTIMONY OF LANCE CORPORAL HOWARD G. WOMMACK.
II. THE GOVERNMENT FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT APPELLANT INTENDED TO KILL LANCE CORPORAL TEITZEL.

2. The appellant pleaded guilty to the lesser included offense of negligent homicide of his fellow Marine in violation of Article 134, UCMJ, 10 U.S.C. § 934. His plea constituted a judicial admission of all the elements of unpremeditated

murder except an intent to kill or to severely injure the victim.

3. Generally, this element is satisfied if the accused intended only to inflict great bodily harm on the victim. Under the facts of this case, this option is not applicable. The appellant aimed his rifle at the victim's head, 8″ to 12″ from his face. Clearly, he meant to kill him or, based on his belief that the weapon would not fire, he did not intend to injure him at all. No other "intent" can be reasonably inferred from these facts.

proved from circumstantial as well as direct evidence. *United States v. Barnes,* 15 M.J. 121, 123 (C.M.A.1983); *United States v. Pruitt,* 12 U.S.C.M.A. 322, 30 C.M.R. 322 (1961). In fact, unless the accused himself states his intent, circumstantial evidence is usually the means by which intent is proved. In this regard, we may infer that a person intends the natural and probable consequences of an act purposely done. Manual for Courts–Martial (MCM), United States, 1984, para. 43c(3)(a). The circumstances which bear on this determination were thoroughly laid out on the record for the members by the military judge. Record at 370–371.

■ Normally, when a man points a loaded rifle at another's head and pulls the trigger, it is apparent that he intends to kill. However, in this case, the appellant stated in his confession that, at the time, he believed the safety toggle switch was in the "safe" position but discovered later that he had inadvertently shifted the switch aft from "semi" to "burst" vice forward from "semi" to "safe." One look at the M–16A2 rifle (Pros. Ex. 28) reveals that these two positions ("safe" and "burst") are on opposite sides of the switch, with "semi" situated between the two of them. Further, the switch can be moved without looking directly at it. If believed, this mistake by the appellant would belie an intent to kill.

Without more, one might justifiably dismiss the appellant's assertion as self-serving, but, in this case there is more. The strongest evidence supporting the appellant's denial of an intent to kill, in our opinion, is his immediate reaction when the shot was fired. An angry refusal to accept what he had just done and urging the victim to "get up" and (albeit, in his own words) to not "die on me," are exactly what one would expect to see from a person who had just unintentionally done something terrible. Consistent with this reaction as well are his nearly immediate call for assistance and his attempts to stop the victim's bleeding.

Moreover, we see no conceivable reason for this appellant to take the victim's life, especially in broad daylight and on duty when he could not possibly have avoided being implicated. No long term or recent evidence of animosity or other basis for a motive was introduced. If anything, these two Marines appeared to be on good terms. Although motive is not an element, the lack of one is probative, particularly when the appellant asserts that he did not intend to kill the victim.

Finally, we find little significance in the appellant's subsequent statements. Clearly, he resorted to a "damage control" posture at that time as evidenced by his statement that the victim shot himself and that he (the victim) would not be around to speak the truth. These statements evince a callous, self-centered attitude regarding the death of his fellow Marine, not to be admired, but understandable. The important point is that these statements are nearly as probative of a lesser degree of culpability as they are of an intent to kill.

■ To sustain a conviction, proof need not exclude every possible hypothesis of innocence, only every fair and rational hypothesis, except that of guilt. *United States v. Harville,* 14 M.J. 270 (C.M.A. 1982). The proof in this case does not exclude the fair and rational hypothesis that the appellant unintentionally placed (or left) his weapon's safety switch in a firing position vice the "safe" position before he shot the victim. This amounted to grossly careless handling of his weapon and evinced a cavalier disregard for both fundamental weapons safety and, most importantly, the life of his fellow Marine. In other words, we believe the appellant was culpably negligent and, therefore, guilty of the lessor included offense of involuntary manslaughter in violation of Article 119(b), UCMJ, 10 U.S.C. § 919(b). *United States v. Walker,* 10 C.M.R. 773 (1953).

Accordingly, we affirm only so much of the findings of guilty to Charge III and its specification as find that the appellant did, by culpable negligence, unlawfully kill Lance Corporal Eric A. Teitzel, USMC, by shooting him with a rifle, in violation of Article 119(b), UCMJ, 10 U.S.C. § 919(b). We set aside the finding of guilty to un-

premeditated murder and dismiss that portion of Charge III. The remaining findings of guilty are affirmed. The sentence is set aside. A rehearing on the sentence may be ordered by the same or a different convening authority. *United States v. Peoples*, 29 M.J. 426 (C.M.A.1990).

Senior Judges STRICKLAND and ORR concur.